UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
————————————————————————————— )
                              )
UNITED STATES OF AMERICA,     )
                              )
            Plaintiff,        )
                              )
      v.                      )    C.A. No. 14-78 S
                              )
RHODE ISLAND DEPARTMENT OF    )
CORRECTIONS; and              )
STATE OF RHODE ISLAND,        )
                              )
                              )
            Defendants.       )
————————————————————————————— )
```

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, Chief Judge.

The Court is confronted with a seemingly straightforward pair of inquiries.  First, what, if any, procedural prerequisites must the United States Attorney General abide by in bringing a lawsuit under Section 707 of Title VII?  Second, does any statute of limitations apply to such a lawsuit under Section 707(a)?  Upon consideration and analysis, these questions are anything but simple and require an extensive examination of Title VII.[1]

---

[1] As some courts have noted, there is a "'general dearth of authority' on the issue of what Title VII prerequisites the United States is required to follow" under Section 707(a). United States v. McHenry Cnty., No. 94 C 50086, 1994 WL 447419, at *4 (N.D. Ill. Aug. 17, 1994) (quoting United States v. N. Mariana Islands, Civ. A. No. 92-0016, 1993 WL 763588, at *1

Here, the United States Attorney General ("Attorney General" or "Government") initiated a lawsuit under Section 707 of Title VII against the Rhode Island Department of Corrections ("DOC") and the State of Rhode Island (collectively "Defendants"), alleging that the DOC engaged in a pattern or practice of unintentional discrimination in its hiring practices of correctional officers from 2000 to present. The Attorney General seeks an injunction to prevent future discrimination and back-pay damages to "make whole" those who have been harmed by the discriminatory practice in the past. The DOC has moved to dismiss the Complaint (ECF No. 9), arguing that the Attorney General failed to comply with the procedural prerequisites set out in Title VII, and did not bring this lawsuit within the time period required to obtain back pay.

Because the Court determines that the Attorney General need not clear the procedural hurdles set forth in Section 706 of Title VII, and is not bound by a statute of limitations, the DOC's Motion to Dismiss is DENIED.[2]

---

(D.N.M.I. Nov. 18, 1993)). Since the McHenry and Northern Mariana Islands decisions this deficit has remained.

[2] In practical effect the DOC's Motion to Dismiss functions alternatively as a Motion to Limit Damages, since it seeks to partially cut off liability under a statute of limitations. Consideration of this alternative is appropriate here because the DOC advances a legal, not factual, argument. See Rob Evans & Assoc., LLC v. United States, C.A. No. 12-cv-30130-MAP, 2013 WL 8351202 at *16 (D. Mass. Nov. 20, 2013) report &

I.  Background

    A.  Facts[3]

    Since 2000, the DOC has used written and video examinations
for screening and selecting candidates for entry-level
correction officer ("CO") jobs.  (Compl. ¶¶ 9-10.)  Candidates
must obtain passing scores on each of these exams to be placed
on an eligibility list for CO positions.  (Compl. ¶ 11.)  DOC
then places applicants on an eligibility list in descending
order based solely on their video examination scores.

    From 2000 to 2011, approximately 94% of white applicants
passed the written examination for entry-level CO positions
compared to 74% of Hispanic applicants and 74% of African-
American applicants.  (Compl. ¶¶ 16-17.)  During the same time
period, approximately 66% of white applicants passed the video
examination for entry-level CO positions compared to 37% of
Hispanic applicants and 47% of African-American applicants.
(Compl. ¶¶ 22-23.)  Considering the scores from both tests

_____

recommendation adopted, C.A. No. 12-cv-30130-MAP, 2014 WL
1304014 (D. Mass. Mar. 31, 2014) (holding Court may properly
consider limitation of damages on motion for judgment on
pleadings where question of limiting damages turns on legal
determination); see also Warner v. United States, C.A. No. 09-
036-ML, 2010 WL 2024766, at *1 (D.R.I. May 18, 2010) (limiting
damage recovery in pre-trial motion).

    [3] The facts are taken from Plaintiff's Complaint and are
assumed to be true.  Bell Atl. Corp. v. Twombly, 550 U.S. 544,
555 (2007).  The parties also agree that they discussed a
negotiated settlement in November 2013, but no such agreement
was reached.

combined, approximately 63% of white applicants passed both tests compared to 33% of Hispanic applicants and 41% of African-American applicants from 2000 to 2011. (Compl. ¶¶ 24-25.) The DOC initiated the written and video examination process most recently in November 2013, but the results from this round of testing have not been used.

On February 2, 2014, relying upon these statistics, the United States Department of Justice ("DOJ") initiated this lawsuit on behalf of the Attorney General, seeking injunctive relief and back pay for those individuals affected;[4] the investigation into whether such a lawsuit should be filed began long before that date. In a letter sent in September 2009, the DOJ stated that it had information indicating that "the percentages of black, Hispanic and female correctional officers at the [DOC] are significantly lower than would be expected for an agency of this type." The letter further informed the DOC that the DOJ would be conducting an investigation into whether a pattern or practice of discrimination was to blame for this discrepancy.

---

[4] While the Complaint alleges improper conduct by the DOC since 2000, during oral argument, the DOJ specified that it would only be seeking back pay for conduct "starting two years before the notice of investigation letter when the United States provided Rhode Island with notice that it could face Title VII liability for the way it hires correction officers." (Tr. of Mot. to Dismiss 23, ECF No. 21.)

This investigation concluded in November 2013, when the DOJ notified the state of the Attorney General's intention to bring suit if a negotiated resolution could not be reached.[5]  No resolution was reached.

B.   Statutory Framework

1.   Title VII

The Attorney General has brought this case pursuant to Section 707(a) of Title VII.  In pertinent part, this provision states:

> Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint . . . .

42 U.S.C. § 2000e-6(a).  Some courts have held that to initiate a case under Section 707(a), the Attorney General must merely comport with the letter of this statute and believe that reasonable cause exists to file a suit.  See United States v. Masonry Contractors Ass'n. of Memphis, Inc., 497 F.2d 871, 875-76 (6th Cir. 1974); United States v. New Jersey, 473 F. Supp. 1199, 1203-05 (D.N.J. 1979) (same); Lanning v. Se. Pennsylvania Transp. Auth., 176 F.R.D. 132, 140 (E.D. Pa. 1997) ("It is well-

---

[5] From September 2009 to November 2013, the DOC cooperated with the Government investigation.

established that the administrative requirements of Section 706, including the obligation to engage in conciliation, do not apply to cases brought by the Attorney General under Section 707."). At least one court, however, has opined that the Attorney General is likely bound to follow the prerequisites found in Section 706 of Title VII, which are discussed in more detail below. United States v. Fresno Unified Sch. Dist., 592 F.2d 1088, 1095-96 (9th Cir. 1979) (noting that it appeared as though Congress intended to apply the requirements of Section 706 to Section 707).

Meanwhile, a different subsection of Section 707 authorizes the Equal Employment Opportunity Commission ("EEOC") to "investigate and act on a charge of a pattern or practice of discrimination, whether filed by or on behalf of a person claiming to be aggrieved or by a member of the Commission." 42 U.S.C § 2000e-6(e). Such actions, however, "shall be conducted in accordance with the procedures set forth in [Section 706] of this title." Id.

These Section 706 procedures require, among other things, that an individual alleging an unlawful employment practice must file a charge with the EEOC within 180 days of the alleged unlawful employment action. Id. § 2000e-5(e)(1). The EEOC then provides the employer with notice of this charge. Id. § 2000e-5(b). Section 706 further requires that the EEOC promptly

investigate any unlawful employment action within 120 days. Id. at § 2000e-5(b). If the EEOC determines that "there is reasonable cause to believe that the charge is true," then it must engage in conciliation to try to informally eliminate the offending action. Id. § 2000e-5(b). Section 706(e)(3)(B) limits back pay to two years preceding the filing of a charge with the EEOC.

The parties' contentions in this case require a close examination of the history of Section 707. While "Section 707(a) of Title VII . . . has remained unchanged since its enactment as part of the Civil Rights Act of 1964," United States v. City of Yonkers, 592 F. Supp. 570, 573 (S.D.N.Y. 1984), the 1970s saw significant upheaval with respect to the remaining subsections of Section 707. This statutory turmoil was discussed in great detail in City of Yonkers and will be recounted here briefly.

First, in 1972, Congress amended the definition of "person" in Title VII, to include "governments, governmental agencies [and] political subdivisions." 42 U.S.C. § 2000e(a); Pub. L. No. 92-261, § 2(1), 86 Stat. 103 (1972); see also City of Yonkers, 592 F. Supp. at 573. Second, Congress added two new subsections to Section 707 in 1972 -- Sections 707(c) and 707(d). Section 707(c) provided that, effective March 24, 1974, the EEOC would take over the functions of the Attorney General

7

"under this section . . . unless the President submits, and neither House of Congress vetoes, a reorganization plan pursuant to chapter 9 of Title 5, inconsistent with the provisions of this subsection. The Commission shall carry out such functions in accordance with subsections (d) and (e) of this section." Section 707(d) simply provided that when the functions of the Attorney General were transferred to the EEOC, any pending case "shall continue without abatement, all court orders and decrees shall remain in effect, and the Commission shall be substituted as a party for the United States of America, the Attorney General, or the Acting Attorney General, as appropriate."

From 1974 to 1978 confusion reigned in the federal courts concerning whether Section 707(c) completely stripped the Attorney General of authority to initiate pattern or practice lawsuits. See New Jersey, 473 F. Supp. at 1203-05 (discussing evolution of statute). In an attempt to clear up this confusion, in 1978 President Jimmy Carter issued Reorganization Plan No. 1 under the Reorganization Act of 1978. This Reorganization Plan stated:

> Any function of the [EEOC] concerning initiation of litigation with respect to State or local government, or political subdivisions under Section 707 of Title VII of the Civil Rights Act of 1964, as amended, (42 U.S.C. 2000e-6, [section 2000e-6 of this title] and all necessary functions related thereto, including investigation, findings, notice and an opportunity to resolve the matter without contested litigation, are hereby transferred to the Attorney General, to be

exercised by him in accordance with procedures consistent with said Title VII [section 2000e et seq. of this title]. The Attorney General is authorized to delegate any function under Section 707 of said Title VII [section 2000e-6 of Title 42, The Public Health and Welfare]. The Attorney General is authorized to delegate any function under Section 707 of said Title VII to any officer or employee of the Department of Justice.

Reorganization Plan No. 1 of 1978, 43 Fed. Reg. 19807, 92 Stat. 3781, reprinted at 5 U.S.C. App. at 423.

This plan was transmitted by the President to Congress on February 23, 1978. United States v. Baltimore Cnty., Civil Action No. H78-836, 1978 WL 93, at *2-3 (D. Md. July 3, 1978). Through Congressional inaction it became law. See 5 U.S.C. § 906; H.R. Rep. 98-128 (noting that the current version of the Reorganization Act differs from the pre-1984 version in an important way – namely the pre-1984 version provided that reorganization plans became effective unless either house of Congress passed a resolution disapproving of the plan within a required period of time). At the time Reorganization Plan No. 1 of 1978 became effective, President Carter issued Executive Order No. 12068, specifying that this order was meant "to clarify the Attorney General's authority to initiate public sector litigation under Section 707 of Title VII of the Civil Rights Act of 1964." Executive Order No. 12068 also specified that "[t]he functions transferred to the Attorney General by section 5 of the Reorganization Plan Number 1 of 1978 [set out

as a note under section 2000e-4 of this title] shall, consistent with section 707 of Title VII of the Civil Rights Act of 1964, as amended [this section], be performed in accordance with Department of Justice procedures heretofore followed under section 707." Exec. Order No. 12068, 43 Fed. Reg. 19807 (June 30, 1978).

    2.    The Reorganization Act

Finally, to properly examine the impact of the Reorganization Act, one must understand that peculiar statute. The Reorganization Act provides a mechanism for the President "to promote the better execution of the laws" and "more effective management of the executive branch." 5 U.S.C. § 901(a)(1). Under this law, the President may "from time to time examine the organization of all agencies and shall determine what changes in such organization are necessary." Id. at § 901(d). When the President decides reorganization is needed, he must send his proposal for such a change to Congress.

At the time President Carter sent Reorganization Plan No. 1 of 1978 to Congress, the Reorganization Act contained a legislative veto provision, which permitted either the House of Representatives or the Senate to derail a proposal by passing a resolution. See id. § 906; H.R. Rep. 98-128. Therefore, Reorganization Plan No. 1 of 1978 became law through

congressional inaction, rather than affirmative approval from legislators.[6]

DOC's Motion to Dismiss argues that the Attorney General failed to follow the required procedures set out in Section 706 of Title VII. Alternatively, the DOC argues that the Attorney General failed to file its lawsuit within the applicable statute of limitations to obtain individual relief. In response, the DOJ asserts that the Attorney General is not required to comport with any prerequisites and must merely have reasonable cause to bring a suit under Section 707(a).

II. Discussion

A.   Section 707(a) and Statutory Prerequisites

After careful consideration, the Court has determined that the Attorney General, while bringing a lawsuit pursuant to Section 707 of Title VII, is not required to adhere to any of the statutory prerequisites found in Section 706 of that statute.   This holding is consistent with the weight of authority on the issue.   New Jersey, 473 F. Supp. at 1203-05; Lanning, 176 F.R.D. at 140; cf. EEOC v. Freeman, No. RWT

_____

[6] Ultimately, in INS v. Chadha, 462 U.S. 919 (1983), the Supreme Court held these kinds of legislative vetoes were unconstitutional.   This Court need not delve into the impact Chadha has on this case since Congress subsequently "ratifie[ed] and affirm[ed] as law each reorganization plan" implemented before the Chadha decision.   Pub. L. No. 98-532, § 1, 98 Stat. 2705 (1984); Guidry v. Sheet Metal Workers Int'l Ass'n, Local No. 9, 10 F.3d 700, 709 (10th Cir. 1993).

09cv2573, 2010 WL 1728847, at *4 (D. Md. Apr. 27, 2010) ("Suffice it to say, the EEOC's authority, unlike that possessed by the DOJ, is restricted by the procedures set forth in Section 706.").

There is no doubt that the Attorney General was under no burden to comply with Section 706 prior to the 1972 amendments to Section 707. See Masonry Contractors Ass'n, 497 F.2d at 875-76. Whether these amendments, coupled with Reorganization Plan No. 1 of 1978 and Executive Order No. 12068, created additional obligations for the Attorney General is the question presented here. Executive Order No. 12068 and Reorganization Plan 1 contain slightly different language. Whereas under the Executive Order the Attorney General is ordered to perform his duties consistent with "Section 707 of Title VII" and DOJ policies, Reorganization Plan No. 1 calls upon the Attorney General to act "in accordance with procedures consistent with said Title VII [section 2000e et seq. of Title 42, The Public Health and Welfare]."

In Executive Order No. 12068, President Carter identified the United States Constitution and the Reorganization Act as his sources of power. "If an executive order has a specific statutory foundation it is given the effect of a congressional statute." City of Albuquerque v. U.S. Dep't of Interior, 379 F.3d 901, 913-14 (10th Cir. 2004) (holding statute giving

12

President authority to set "policies and directives" necessary to enforce the Federal Property and Administrative Services Act of 1949 provided statutory foundation for executive order related to the selection of federal office space in urban areas); Farkas v. Texas Instrument, Inc., 375 F.2d 629, 632 n.1 (5th Cir. 1967) (holding statute related to government procurement provided statutory foundation for executive order prohibiting discrimination in government contracting); see also Contractors Ass'n of E. Pa. v. Sec'y of Labor, 442 F.2d 159, 167-71 (3d Cir. 1971) (discussing history of executive orders).[7] Meanwhile, if an executive order conflicts with an existing statute, the executive order must fall. See Chamber of Commerce of U.S. v. Reich, 74 F.3d 1322, 1332-34 (D.C. Cir. 1996).

In this case, the Reorganization Act gave the President the authority to issue Executive Order No. 12068. New Jersey, 473 F. Supp. at 1205 n.13. Thus, both Reorganization Plan No. 1 and Executive Order 12068 carry the effect of Congressionally enacted statutes, which became effective at roughly the same time but which contain somewhat varied language. The Court "[declines] to read the statutes as being in irreconcilable

---

[7] Supreme Court Justice Robert H. Jackson famously reasoned that a President is acting at the height of his authority when he acts pursuant to express or implied authorization from Congress. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635-38 (1952) (Jackson, J., concurring).

conflict without seeking to ascertain the actual intent of Congress." Watt v. Alaska, 451 U.S. 259, 266 (1981).

The 1972 amendments to Section 707 were widely seen as divesting the Attorney General of the power to bring pattern or practice lawsuits. See, e.g., New Jersey, 473 F. Supp. at 1203-05. Reorganization Plan No. 1 sought to correct this apparently unintended consequence. See Executive Order No. 12068. Nowhere in the history surrounding the 1972 amendments, Reorganization Plan No. 1, or Executive Order No. 12068 does Congress or the President make plain their intention to impose new requirements on the Attorney General in bringing an action under Section 707(a). Congress or the President "might be expected to have mentioned a change" that would so significantly alter the obligations of the Attorney General under Title VII. See Watt, 451 U.S. at 271. The best reading of Reorganization Plan No. 1 and Executive Order No. 12068 is the approach taken by most courts to date, see, e.g., Lanning, 176 F.R.D. at 140, which have held that these two documents clarify that the Attorney General may bring pattern or practice lawsuits, but do not create additional requirements for the Attorney General in doing so.[8]  See also New Jersey, 473 F. Supp. at 1205 (reviewing

---

[8] United States v. Fresno Unified Sch. Dist., 592 F.2d 1088, 1095-96 (9th Cir. 1979) remains the only case that cuts against this determination 35 years after that opinion was issued. Even still, the statement in Fresno that Congress intended to impose

14

legislative history and holding that following statutory amendment in 1972 and Reorganization Plan No. 1 in 1978, Attorney General was not required to follow prerequisites of Section 706); Baltimore Cnty., 1978 WL 93, at *4 ("The terms of the Reorganization Plan specify that the Attorney General should exercise his authority 'in accordance with procedures consistent with said Title VII.' The Attorney General is not under the law required to follow regulations promulgated by the Equal Employment Opportunity Commission which apply where a private employer is involved.").

For the reasons stated above, the DOC's Motion to Dismiss with respect to the Attorney General's obligations to follow the prerequisites found in Section 706 of Title VII is denied.[9]

B.   Section 707(a) and Statute of Limitations

The statutory prerequisites found in Section 706 discussed above effectively limit the potential back-pay exposure faced by defendants in a Title VII lawsuit to two years from the filing of a charge with the EEOC. 42 U.S.C § 2000e-5(e)(3)(B). For

_____

the requirements of Section 706 on the Attorney General in Section 707 is dicta. The Ninth Circuit in Fresno recognized that neither of the parties before it had addressed this issue and that the question was not properly before the court.

[9] Still, if the Attorney General was obligated to satisfy these requirements, he did so by informing the DOC of the charges leveled against it first in September 2009 and more fully in November 2013, and then engaging in meaningful conciliation.

15

this and other reasons, the Supreme Court held that no statute of limitations applies to an action brought under Section 706. Occidental Life Ins. Co. of Cal. v. EEOC, 432 U.S. 355, 367-72 (1977). Section 707(a) has no similar prerequisites, and this distinguishes the present case from Occidental. It is at least arguable that some statute of limitations or damage limitation should be applied to an action brought by the Attorney General, which might result in individuals receiving back pay. Otherwise, the Attorney General could wait for many years to initiate a lawsuit, and then demand a vast back pay award for putative victims of discrimination – a result that would be both unfair to the state defendant, and virtually impossible to administer.

The DOC argues that the Attorney General must be subject to a statute of limitations when pursuing back pay for individuals, citing authority from the Fifth Circuit Court of Appeals that is now more than 40 years old. See United States v. Georgia Power Co., 474 F.2d 906, 919 (5th Cir. 1973).[10] The DOC proposes that

_____

[10] The DOC's argument that a statute of limitations should apply has logical appeal. If no limitation period applies, a defendant in a Section 707(a) case could face back pay liability limited only by the passage of Title VII in 1964, whereas a defendant to a lawsuit brought under Section 706 or Section 707(e) would face liability for only two years from the filing of a charge. Such a dynamic appears untenable. On the other hand, Section 707(a) contemplates lawsuits based on a "pattern or practice." Patterns or practices are not discrete events and

16

the Rhode Island statute of limitations for actions brought against the state apply to this case. However, for the reasons that follow, the Court agrees with the Attorney General that subsequent precedent has eroded the force of Georgia Power. As a result, the DOC's Motion to Dismiss with respect to its statute of limitations issue is denied.

Still, the Court has reservations about this outcome. These concerns are dissipated in part by the DOJ's statement during oral argument that it will only pursue back pay from September 2007 onward. Additionally, when the DOC submits its Answer to the Complaint, the DOC could raise laches as a defense in an attempt to further limit damages. See Marshall v. Intermountain Elec. Co., 614 F.2d 260, 261-62 (10th Cir. 1980).

Under Section 707(a), the Attorney General may request "such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure full enjoyment of the rights herein described." Courts have understood this provision to confer upon the Attorney General the right to obtain back pay for aggrieved individuals. Georgia Power, 474 F.2d at 919 (discussing legislative history of Title VII, which indicates

---

only come into focus through time, suggesting a hard and fast limitation period may well be contrary to the will of Congress.

desire to permit Attorney General to pursue back pay); see also Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 360-62 (1977) (discussing ability of Government to pursue individual relief in Title VII lawsuit).

Long-standing precedent establishes that the United States Government need not adhere to any statute of limitation when enforcing sovereign rights, unless Congress has expressly created a time limit. See Guar. Trust Co. of N.Y. v. United States, 304 U.S. 126, 132-33 (1938) (explaining that rule exempting Government from statute of limitations "appears to be a vestigial survival of the prerogative of the Crown" but may not be justified "because its benefit and advantage extend to every citizen, including the defendant, whose plea of laches or limitation it precludes; and its uniform survival in the United States has been generally accounted for and justified on grounds of policy rather than upon any inherited notions of the personal privilege of the king.") This proposition, however, does not apply when the Government enforces private rights. Marshall, 614 F.2d at 262. Thus, the question here is whether pursuit of back pay constitutes a public or private right under Section 707(a).

The case most on point with respect to this issue is Georgia Power. There, the Fifth Circuit Court of Appeals held that when the Attorney General brings a lawsuit for back pay

under Section 707(a) the federal district court should "borrow the limitations period prescribed by the state where the court sits." Georgia Power, 474 F.2d at 923 (internal citation and quotation marks omitted); see also Masonry Contractors Ass'n, 497 F.2d at 877 (adopting Georgia Power's holding that applicable state statute of limitation should apply, but finding that defendant had failed to raise statute of limitations as a defense). The court in Georgia Power reasoned that when a pattern or practice lawsuit acts as a "legal conduit for the recovery of sums due individual citizens rather than the treasury, it is a private and not a public action" and is therefore subject to a statute of limitations. Georgia Power, 474 F. 2d at 923.

The Attorney General argues that two United States Supreme Court cases issued after Georgia Power and Masonry Contractors Association render those decisions inapplicable because these more recent cases establish that, even when pursuing individual benefits in a Title VII case, the Government acts within its sovereign capacity. See EEOC v. Waffle House, Inc., 534 U.S. 279, 287-88 (2002); Gen. Tel. Co. of the Nw., Inc. v. EEOC, 446 U.S. 318, 326 (1980). In General Telephone, the Supreme Court held that "[w]hen the EEOC acts, albeit at the behest of and for the benefit of specific individuals, it acts also to vindicate the public interest in preventing employment discrimination."

446 U.S. at 326.  The Court reasoned that the 180 day exclusive jurisdiction possessed by the EEOC under Section 706 established that the agency was not serving merely as a proxy for bringing these actions.  Id. at 323.  In Waffle House, while addressing an unrelated issue, the Supreme Court reaffirmed its position that the EEOC did not merely serve as a proxy in bringing actions under Title VII.  Waffle House, 534 U.S. at 288.  The Government argues, with a great deal of persuasion, that when bringing a Section 707(a) action the Attorney General similarly acts for the benefit of individuals while vindicating the public interest.  Waffle House and General Telephone are obviously not directly on point; both involved the EEOC, not the Attorney General, and as discussed above there are differences.  But these differences do nothing to lessen the larger point made by the Supreme Court in these cases – indeed, the interest of the public may be even more central to an action brought by the federal government against a state agency such as the DOC.

Without relying on General Telephone or Waffle House, the district court in City of Yonkers reached the conclusion the Attorney General champions.  City of Yonkers, 592 F. Supp. at 589.  There the district court exhaustively analyzed the history of Section 707(a) and found that because Title VII vindicates a broad public interest, a statute of limitation should not apply. Id. at 588.  The Court reasoned: "Though the relief sought may

include back pay for specific individuals or a class, the pattern-or-practice action is decidedly not 'a case where the Government, although a nominal complainant party, has no real interest in the litigation, but has allowed its name to be used therein for the sole benefit of a private person.'" Id. (quoting United States v. Beebe, 127 U.S. 338, 344 (1888)); see also Franks v. Bowman Transp. Co., 424 U.S. 747, 778 n.40 (1976) (stating that claims brought "under Title VII involve the vindication of a major public interest").

City of Yonkers is forceful precedent and it is buttressed by the Supreme Court holdings in General Telephone and Waffle House. But the question of how the holding of Georgia Power and the rationale of Masonry Contractors Association is affected by these two cases appears to be an open question, not directly addressed to date by any court.[11] Thus, it is useful for the Court to look to other federal statutes that potentially confer both public and private benefits for guidance.

---

[11] City of Yonkers conducted a similar inquiry but did not rely on General Telephone and did not have the benefit of Waffle House. Additionally, when the Ninth Circuit Court of Appeals heard EEOC v. Occidental Life Insurance Co. of Cal., that court rejected the holding of Georgia Power, relying instead on Fifth Circuit Court of Appeals precedent concerning the National Labor Relations Act, which held that no statute of limitations applies pursuant to that law even when pursuing back pay. EEOC v. Occidental Life Ins. Co. of Cal., 535 F.2d 533, 538 (9th Cir. 1976), aff'd, 432 U.S. 355 (1977).

Two examples shine through. First, as discussed by the Ninth Circuit in Occidental, when pursing back pay under the National Labor Relations Act the Government is not subject to a statute of limitations. Nabors v. NLRB, 323 F.2d 686, 688-89 (5th Cir. 1963) (holding that NLRB acts in public capacity and "[t]he fact that these proceedings operate to confer an incidental benefit on private persons does not detract from this public purpose"). The Occupational Safety and Health Act of 1970 also provides a mechanism by which an arm of the federal government, the Secretary of Labor, may secure monetary benefits for individuals through litigation. See Marshall, 614 F.2d at 261-62. The Tenth Circuit Court of Appeals held that because these actions implicate both public and private rights, no state statute of limitation should apply. Id. at 263. The Tenth Circuit held, however, that in "hybrid" actions where the Government vindicates both of those kinds of rights, "the doctrine of laches may be applied . . . to limit relief." Id.

After reviewing the history of Title VII in general and Section 707(a) in particular, analyzing the caselaw decided under Title VII, and reviewing caselaw from analogous federal statutes, the Court finds that no statute of limitation should apply to the Attorney General in this case, even though he seeks both an injunction and back pay for individuals. The potential unfairness of this situation suggests some middle ground may be

appropriate. The Court finds merit in the compromise found by the Tenth Circuit in Marshall.

Here, the Attorney General vindicates sovereign rights by obtaining an injunction precluding the public employer from discriminatory employment actions. He vindicates public and private rights in obtaining individual back pay. Therefore, the DOC is not prohibited from seeking to limit damages further by the application of laches at a later stage in this case.[12] For now, however, the Attorney General is subject to no statute of limitations, but will be held to its representation to the Court at oral argument that he will only pursue back pay from September 2007 onward.

III. Conclusion

For the reasons set forth above, Defendant's Motion to Dismiss is DENIED.

IT IS SO ORDERED.

_William E. Smith_
William E. Smith
Chief Judge
Date: January 29, 2015

---

[12] The Supreme Court noted in Occidental that "when a Title VII defendant is in fact prejudiced by a private plaintiff's unexcused conduct of a particular case, the trial court may restrict or even deny [back pay] relief . . . . The same discretionary power to locate a just result in light of the circumstances peculiar to the case, can also be exercised when the EEOC is the plaintiff." Occidental 432 U.S. at 373 (internal citations and quotation marks omitted).