# EXHIBIT C

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


UNITED STATES OF AMERICA      :
                              :
        VS.                   :C.A. NO.:
                              :114-cv-00078-S-LDA
STATE OF RHODE ISLAND,        :
RHODE ISLAND DEPARTMENT       :
OF CORRECTIONS                :


        DEPOSITION of MEREDITH BURRELL, a
30(b)(6) Witness on behalf of the Department
of Justice, in the above-entitled cause,
taken on behalf of the Defendants, Before
Barbara Warner, RPR, Notary Public in and for
the State of Rhode Island, at the offices of
the Rhode Island Department of Attorney
General, 150 South Main Street, Providence,
RI, on March 3, 2016 at 9:00 a.m.

6

(DEPOSITION COMMENCED AT 9:00 A.M.)

MEREDITH BURRELL

Being duly sworn, deposes and testifies as follows:

THE REPORTER:  Would you state your name and spell your last name for the record.

THE WITNESS:  Meredith Burrell, B-U-R-R-E-L-L.

EXAMINATION BY MS. YAFFEE

MS. YAFFEE:  Mark this as Exhibit 600.

(EXHIBIT 600 MARKED FOR IDENTIFICATION)

Q. For the record, this is the deposition of Meredith Burrell taken pursuant to the Federal Rules of Civil Procedure in the case of the United States versus the State of Rhode Island and the Rhode Island Department of Corrections.  It is Civil Action Number 114-cv-00078-S-LDA.  Good morning.

A. Good morning.

Q. My name is Ariele Yaffee.  I'm a Special Assistant Attorney General with the State of Rhode Island.  To my left is Neil Kelly and Mariana Ormonde, also on behalf of the state

9

A. I don't believe I have looked at it in this form, but I am familiar with the information under Matters for Examination.

Q. Do you understand that you have been designated to respond on behalf of the Department of Justice related to matters 1, 2, 3, 4, 6, 7 and 8 listed in this notice?

A. Yes.

Q. And you are currently employed by the Department of Justice, correct?

A. Yes.

Q. What division are you in?

A. In the Civil Rights Division.

Q. Is that in the Employment Litigation Section?

A. The Employment Litigation Section is a component of the Civil Rights Division.

Q. What is your title, Ms. Burrell?

A. Deputy Chief.

Q. How long have you held that title?

A. Since approximately October of 2010.

Q. And how long have you been with the Department of Justice?

A. I started in September 1999.

Q. Have you had other positions during your time at the Department of Justice?

10

A. Yes.

Q. Can you tell us what positions you have held?

A. Sure.  In September of 1999, I was hired as a trial attorney in the Employment Litigation Section of the Civil Rights Division.  I stayed in that position until early 2003, when I moved to a position as a trial attorney in the Civil Division on the Tobacco Litigation Team.  I worked for that component from 2003 until late 2005.

Thereafter, I became a trial attorney still in the Civil Division in the Civil Fraud Section from 2005 until October of 2008.  In October of 2008, I returned to the Employment Litigation Section as a trial attorney.

Q. Did you bring anything with you to this deposition today?

A. Yes.  I have a binder of correspondence.

Q. Can you tell me how that binder was put together?

A. It was given to me by my counsel.

Q. And how did you prepare for this deposition?

A. I prepared for this deposition by reviewing materials provided to me by counsel

13

the case.

Q.   When did you cease being the deputy chief assigned to the case?

A.   I started maternity leave in November of 2013.  When I returned from maternity leave, I was deputy chief briefly and the matter was reassigned to another deputy chief.

Q.   Can you tell us how the records of the Department of Justice are kept for these investigations?

A.   When you say these investigations, do you mean 1993 and 2009?

Q.   Yes.  I'm sorry.

A.   For the 2009 investigation, the trial attorneys keep their personal records and there are also materials that are provided to paralegals who keep official files of correspondence and the like.  Attorneys have their own electronic records.  And there are also electronic records stored on a sort of central folder that all of the team members can access of pleadings, et cetera, those sorts of things.

             I cannot tell you how records were kept in 1993.  I can discuss our search for

14

records relevant to the matters in the notice.

Q.  If you would, please, yes.

A.  Sure.  We reviewed -- well, for paper records, we reviewed paper files that are maintained in the Employment Litigation Section, as well as the Federal Records Center, which is an entity that materials get sent to for archiving.

We retrieved records from the Federal Records Center and searched files in ELs.  Those files would be files that were organized based on the relation to the investigation.

We also searched electronic files that still exist relating to the investigation.  Those would be the electronic files of any staff who were assigned to the investigation that still exist on our server.  I think that's it with regard to paper and electronic records.

Q.  Are there record retention schedules with the Department of Justice for investigations like the '93 and 2009 investigations?

A.  I don't believe there are necessarily

Meredith Burrell, 30(b)(6) - March 03, 2016

15

formal schedules.  I mean, I don't think there are formal schedules.  That is based on my personal knowledge more than my knowledge as a representative of the United States.

Q.  Are you aware of whether or not any of the records from either the '93 or 2009 investigation have been destroyed?

A.  I am not aware of any records from the 2009 investigation being destroyed.  I don't believe I -- I don't think the United States has knowledge at this point regarding the completeness of the files that we were able to identify from the 1993 investigation, but everything that is available to the United States was located.  And I reviewed the non-privileged information in preparation for this deposition.

Q.  Did you keep personal records -- do you know if the personal records of the attorneys that were assigned to the 1993 case were located?

A.  The personal records of those attorneys were -- when an employee leaves the Employment Litigation Section, their records are not maintained, their paper records are not maintained in a way that you can identify

them by these are Attorney so-and-so's records. They may be maintained and filed with records related to the case or investigation. Or if relevant, turned over to attorneys who take over the case when someone leaves.

The records that, the paper records that we identified were from paper files in the Employment Litigation Section identified as relevant to that investigation or from the Federal Records Center.

The electronic files of attorneys are maintained after their departure. I don't know when the process of retaining those electronic files began, but we did not find electronic records for the first attorney assigned to that investigation and for one of the section chiefs who was the chief of the Employment Litigation Section at the time of the investigation. But the other staff assigned to the investigation had electronic records in our system and those records were searched.

Q. Were the -- strike that. Can you just tell me what is contained in this binder that you

150

make changes to its process because of the situation with the union.

Q. And do you know if at any point Ms. Hussain or Ms. Seeley, during this meeting, told the Department of Corrections that if there was an issue, that they would explain that reason for the finding, get input from the Department of Corrections and work it out together, outside of the context of litigation or a consent decree?

A. Ms. Seeley and Ms. Hussain may have discussed that we would inform Rhode Island of our findings and attempt to work out a resolution with Rhode Island. They did not say they would do so outside of the context of a consent decree or filing a complaint.

Q. Is that based on your conversations in preparation for this deposition?

A. That is based on their general recollection of what was conveyed.

Q. Was that ever memorialized after this meeting in any way?

A. Not that I'm aware of.

Q. And you also previously mentioned that they also didn't, Ms. Seeley or Ms. Hussain did

151

not have a recollection specific to whether or not they mentioned noticing findings in the context of a consent decree specifically or litigation; is that correct?

A. Contested litigation.  We would interpret -- I mean, filing a consent decree contemporaneously with a complaint would not be contested litigation.

Q. But I think earlier you had mentioned that they didn't have a specific recollection of that either, it is just --

A. I don't think that's what I said earlier.

MS. BANASZAK:  Objection. Mischaracterizes her testimony.

MS. YAFFEE:  I'm sorry if I'm not clear.

Q. I believe what you earlier stated was they didn't have a specific recollection of addressing the issue of a consent decree in that meeting?

A. That's correct.  My prior answer referenced a consent decree and you asked me if they had a specific recollection of using the words consent decree.  And I responded they didn't tell us that in preparation for

193

know the dates of those communications, but generally the subject related to these productions and questions and clarifications about the data.

Q. Do you know who made those calls?

A. Ms. Banaszak and Ms. Hussain.

Q. Did you speak with Ms. Banaszak and Ms. Hussain about what those calls entailed?

A. I spoke with Ms. Banaszak about that.

Q. What information did Ms. Banaszak relay to you?

A. Well, we discussed the dates and contents of a number of phone calls, a lot of information that I can't commit to memory as to exactly every date when the phone calls were placed and exactly what was discussed. Between April of 2010 and November of 2013, there were --

Q. Sorry to interject. I meant in the period between 2010 and August of 2011, were there any telephone calls then?

A. There were. I know a number of phone calls took place over the longer period of time I mentioned, but I can't for certain say how many of them happened before August of

194

2011.  There were several, but over the entire time period to 2013, a dozen, many of which were during this time frame.

Q. And you mentioned previously that those telephone calls were about the production; is that right?

A. Generally speaking, my recollection is that most of them had to do with production of information responsive to the United States' requests, both information about applicant flow, as well as some of the conversations touched on test development materials.  There may have been other things that were discussed that I can't remember.  I just recall those were the primary topics of conversation.

Q. And you stated that in May 2010 is when Dr. Crane started conducting analyses relevant to the information that had been provided by the Department of Corrections; is that right?

A. Generally speaking.  I mean, that's when Dr. Crane began working with the data.  It had to be pieced together to some degree before she could run actual analyses, but she began to work on it then.

213

does have any information to offer.

A. I don't think I can answer with respect to any internal impressions the department had. The state Department of Corrections certainly did not inquire as to whether we had any concerns at the time.  If they did, we would have discussed them with them.

MS. YAFFEE:  Off the record.

(OFF THE RECORD)

MS. YAFFEE:  Back on the record. Mark this as Exhibit 635.

(EXHIBIT 635 MARKED FOR IDENTIFICATION)

Q.  I am handing you what has been marked as Exhibit 635.  Do you recognize this document, Ms. Burrell?

A. I don't think I have seen this one before.  It is correspondence from Ms. Alexander to Ms. Banaszak, dated September 20, 2011.

Q.  It's bates stamped USA 2391 and it states, As we discussed on September 19, 2011, enclosed on the CD-ROM disk is the Rhode Island Department of Corrections' response to your inquiry dated August 18, 2011; is that correct?

Meredith Burrell, 30(b)(6) - March 03, 2016

214

A. Yes, that's correct.

Q. And that was the second request for information from the Department of Justice?

A. Yes.

Q. And do you know if anything else was discussed in that September 19, 2011 discussion between Ms. Alexander and Ms. Banaszak that is referred to here?

A. I don't.

Q. Did you speak with Ms. Banaszak about that discussion at all?

A. I spoke with Ms. Banaszak about the telephonic communications that occurred. I don't recall anything specific about this particular phone call. Referring back to Exhibit 634, there is a reference to Ms. Alexander having left a voice mail message, indicating that she wouldn't discuss issues surrounding the Classes of 71 through 74 in connection with her Questions 6 and 8.

I guess given the timing of that September 16th and the timing of the September 20th, it is likely that Ms. Alexander's concerns were discussed.

Q. Did the Department of Justice, at that point,

240

prior to November of 2013?

MS. BANASZAK: Objection as to the form. Compound and argumentative. You can answer.

A. Was there any overture to work out areas of concern, is that your question?

Q. Yes.

A. No.

MR. KELLY: Thank you.

MS. YAFFEE: Can we take a quick break. Off the record.

(OFF THE RECORD)

MS. YAFFEE: Back on the record. At this point, the State has no further questions during this deposition and believes that the remaining matters have largely been covered throughout the discussion we have had today. If you do have time, we can take a break and come back. Off the record.

(OFF THE RECORD)

MS. YAFFEE: Back on the record.

EXAMINATION BY MS. BANASZAK

Q. Ms. Burrell, can you please describe the efforts that the United States did undertake to find information regarding our 1990s

241

investigation of RIDOC?

A. Sure.  We searched paper records in the office of the Employment Litigation Section relating to the investigation.  We also retrieved records in the Federal Records Center relating to the investigation.

Additionally, we searched electronic records that are still available to the agency for records relating to the investigation and for records relating to the United States' use of Dr. Joyce Hogan and her assessments.

We searched databases available to the United States relating to expert contracts, which go back to approximately 2004.  We also searched databases related to payments made to experts, which go back further than 2004.  I don't recall how far those records go back, but we searched those databases for indications of contracts with Dr. Joyce Hogan of her assessments.

I don't recall if I said this, but we searched electronic files of former employees who were associated with those investigations, to the extent electronic

242

files exist.  We also searched the electronic files of all current ELS employees for relevant records.

Additionally, we made efforts to contact all of the employees associated with that investigation from the Employment Litigation Section and we reached all of them, except for Mr. Gadzichowski, Mr. Karaskiewicz.  And I believe, Mr. Angus, I believe we did not make efforts to contact Mr. Angus.

Q.  We did not make efforts or we did not contact him?

A.  We did not contact him.

Q.  But we attempted to contact him?

A.  Yes.

Q.  And we talked to Kate Baldwin; is that correct?

A.  Yes.

Q.  And we spoke to Robert Dempsey; is that correct?

A.  Yes.  We also spoke to Richard Gugelow, Mary Beth Martin, Bill Fenton, all of whom were deputy chiefs in the Employment Litigation Section.  I don't recall if we

Meredith Burrell, 30(b)(6) - March 03, 2016

243

spoke to other individuals.  We did speak to Robert Dempsey.

Q.  We also spoke to former employees who may have worked with Dr. Hogan as an expert; is that correct?

A.  Yes.  We spoke to Deputy Chief Richard Gugelow because he was the deputy chief involving management of contracts.  We spoke to former trial attorney Barbara Thally, who worked on a number of assessment cases and worked with a number of experts during that time period.

Q.  Ms. Burrell, you testified about a meeting between the Department of Justice and the Rhode Island Department of Corrections in October of 2009; is that correct?

A.  Yes.

Q.  And prior to this October 2009 meeting, the Department of Justice had sent the Department of Corrections a notice of investigation letter; is that correct?

A.  Yes, that's correct.

Q.  Can you please refer to Exhibit 621, which would be a copy of that letter?

A.  Yes.

245

investigation of RIDOC, did the United States give any assurances to Rhode Island that we would not file a lawsuit if violations of Title VII were found?

A. No.

Q. At any time during our 2009 to 2013 investigation, did the United States tell Rhode Island that we would enter into any type of settlement other than a court order consent decree?

A. No.

Q. Ms. Burrell, you testified earlier about what was discussed during that October 2009 meeting, correct?

A. Yes.

Q. And during your testimony, you discussed some statements that were made by Ms. Seeley; is that correct?

A. Yes.

Q. What did Ms. Seeley say during her introductory remarks at that meeting?

A. As I mentioned earlier, she informed the representatives of the State that we were conducting an investigation and that we had not reached a pre-determined conclusion about

Meredith Burrell, 30(b)(6) - March 03, 2016

246

whether or not a violation of Title VII occurred.

I believe she informed representatives of the State that our focus was not on in any allegation of intentional discrimination.  And that we were intending to review its employment practices to determine whether they had a disparate impact based on race, national origin or sex and outline the parameters of how our investigation would proceed very generally, which, as I testified earlier, included informing Rhode Island that if at the conclusion of our investigation we did not find a violation of Title VII, our investigation would close.

And if we did find a violation of Title VII, we would inform the State of that finding, the basis of that finding, and we would discuss the basis of the finding with them and attempt to work together with them to achieve a resolution that did not require contested litigation.

Q. Earlier you testified that the United States does not know if the word consent decree was

247

used during that conversation, correct?

A. That's correct.

Q. And you testified that the United States does not know whether the word litigation was used during that conversation, correct?

A. That's correct.

Q. In preparing for this deposition, did the United States specifically ask Ms. Seeley if the word consent decree was used?

A. No.

Q. Did the United States specifically ask Ms. Seeley if the word litigation was used?

A. No.

Q. Did the conduct of the United States during our investigation comport with what Ms. Seeley said during that meeting?

MR. KELLY:  Objection.

MS. YAFFEE:  Objection.

A. Yes.  In terms of her introductory remarks, we conducted our investigation. When a finding was made, we notified Rhode Island of the finding and invited Rhode Island to engage in settlement negotiations with us prior to us initiating a lawsuit.

Q. I am going to show you a document; we will

Meredith Burrell, 30(b)(6) - March 03, 2016

248

mark this as Plaintiff's Exhibit 637, to continue the numbers.

A. Okay.

(EXHIBIT 637 MARKED FOR IDENTIFICATION)

Q. Ms. Burrell, do you recognize this?  For the record, this is Plaintiff's Exhibit 637.  It has the bates stamp RI 006336 through 6346.  Ms. Burrell, do you recognize this document?

A. Yes.  These are a copy of notes that I reviewed in preparation for this deposition that were produced in this litigation by the State of Rhode Island.

Q. Looking on the first page, there is a line that starts with, Purpose of meeting; do you see that?

A. Yes, I do.

Q. Can you read that sentence, as you understand it?

A. Purpose of meeting, find out hiring practices and get documents that might be helpful.  We review, close and move on.  If issue, explain reason for finding, get your input, work it out together.  All documents we get from you are covered under privacy act.

Meredith Burrell, 30(b)(6) - March 03, 2016

249

Q. Who made the statement recorded in that line?

A. These are written notes of the October 23, 2009 meeting.  And that is a recording and part of the introductory remarks of Ms. Seeley.

Q. Does the United States dispute what that line says about Ms. Seeley's comments?

A. No.  I mean, this does not reflect the entirety of Ms. Seeley's comments or the entire contacts, but the United States does not dispute that words to this effect were stated at that meeting.

Q. How does that statement compare to what you have just testified about with regard to Ms. Seeley's statements?

MS. YAFFEE:  Objection.

A. I think it is consistent.  Ms. Seeley explained that if we found an issue, which I understand to mean a finding of unlawfulness, that we would talk to Rhode Island about the finding, get Rhode Island's input and attempt to work out together a voluntary resolution in order to avoid contested litigation.

Q. You testified earlier that there was some discussion about the role of the union during

Meredith Burrell, 30(b)(6) - March 03, 2016

273

MS. BANASZAK:  Objection.

A. Well, is there any reason to believe they said those exact words, no, not necessarily.

Q. And you have not spoken to either Ms. Hussain or Ms. Seeley in relation to your preparation for this deposition today; isn't that correct?

MS. BANASZAK:  Objection.

A. My counsel spoke to them and I am aware of what Ms. Seeley and Ms. Hussain said.  They were asked expressly if they gave any assurances that a lawsuit would not be filed, because that is the impression that we had of the State's position, and they completely disagreed with the notion that any such assurance was made during this meeting.

Q. What assurance?

A. That a lawsuit would not be filed.

Q. Let's refer to the notes of Exhibit 637.  It does not indicate in here any of those terms, lawsuit or consent decree or litigation, does it?

MS. BANASZAK:  Objection.

A. It does not state those words.  It also does not state an assurance that a lawsuit