UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff | ) | |
| | ) | |
| Vs. | ) | C.A. No. 1:14-cv-78S |
| | ) | |
| STATE OF RHODE ISLAND, | ) | |
| RHODE ISLAND DEPARTMENT | ) | |
| OF CORRECTIONS | ) | |
| Defendants | ) | |

**Prospective Claimant Jayson Badillo's Objection
To the February 8, 2018 Report and Recommendation**

Prospective Claimant Jayson Badillo hereby objects to the February 8, 2018 Report and

Recommendation that the Court approve the Parties' Proposed Settlement Agreement for these

reasons:

1. It was not appropriate for the magistrate judge who presided over the settlement
   conference that resulted in the settlement to preside over the "fairness hearing" respecting
   the settlement;

2. The parties have the burden of establishing that the proposed settlement is fair,
   reasonable and adequate but they failed to provide the Court with the information
   necessary to make that determination, including the full monetary value of the claims;

3. Based on the information provided by Mr. Badillo to the Court, the amount of monetary
   relief provided for all prospective claimants, $450,000 (hereinafter "Monetary Relief"), is
   grossly inadequate compared to the amount of "back pay" sufficient to "make whole" all
   107 Prospective Claimants, i.e. approximately, $24 million;

1

4.   The Proposed Settlement Agreement's procedures are unfair where they set forth no

reasonable, objective standards to determine how the relief will be awarded among the

Prospective Claimants and where they require Prospective Claimant to execute releases

before they know whether they will be awarded one of the jobs that are part of the relief.

### Factual and Procedural Background

1.   On February 14, 2014, the United States ("Plaintiff") filed suit against Defendants State

of Rhode Island and Rhode Island Department of Corrections ("RIDOC") (collectively

"Defendants") alleging that Defendants had used written and video examinations of applicants

for the position of correctional officer ("CO"); which examinations had a disparate impact on

107 African-American and Hispanic applicants; which examinations were not job-related for the

position in question and consistent with business necessity; and which did not otherwise meet the

requirements of Section 703(k) of Title VII, 42 U.S.C. § 2000e-2(k).  (Complaint ¶¶ 34, Prayer

for Relief).

2.   The Complaint also alleges that Defendants have failed or refused "to 'make whole'

those African-American and Hispanic applicants for appointment to the entry-level CO position

at RIDOC who have been harmed by Defendants' unlawful use of the written and video

examinations."  (Id.).

3.   The Settlement Agreement alleges that this disparate impact on the African-American

and Hispanic applicants occurred between 2000 and 2013, a total of 14 years.  (Settlement

Agreement, pp. 2-3).[1]

---

[1] Notwithstanding the allegations of the Complaint, the United States apparently stipulated that it would seek back pay damages only for a period "starting two years before the notice of investigation letter [in September 2009] when the United States provided Rhode Island with notice that it could face Title VII liability for the way it hires correctional officers."  U.S. v. Rhode Island Dept. of Corrections, 81 F.Supp.3d 182, 185 n. 4 (D.R.I. 2015).

4.      The United States asserts that absent the disparate impact of the revised written exam and video exam, an estimated 52 additional African Americans and 55 additional Hispanics would have been hired (the "Prospective Claimants").  (Parties Memorandum ("Joint Memorandum") in Support of Joint Motion To Provisionally Enter The Settlement Agreement And Schedule A Fairness Hearing ("Joint Settlement Motion"), p. 22, n. 7, and related affidavits).[2]

5.      On January 15, 2015, the Court denied Defendants' motion to dismiss for failure to state a claim upon which relief may be granted holding that the United States was not subject to any statute of limitations.  United States v. R.I. Dept. of Corrections, 81 F.Supp.3d 182 (D.R.I. 2015).  The Court did comment that Defendants may have a laches defense, which defense was apparently addressed at least in part, by the United States' stipulation that it would pursue back pay only from September 2007 forward.  Id. at 192.

6.      On or about June 4, 2015, the Magistrate Judge held an unsuccessful settlement conference.

7.      On September 16, 2016, the Court granted in part and denied in part RIDOC's motion to compel discovery respecting its defense of laches and estoppel.  U.S. v. State of Rhode Island, C.A. No. 14-78S, 2016 WL 4742265 (D.R.I. Sept. 9, 2016).

8.      On December 7, 2016, the Court granted the parties' joint motion to extend discovery deadlines.  The Court subsequently entered text orders staying all deadlines up to May 7, 2017.

9.      On April 20, 2017, the Magistrate Judge held another settlement conference, which conference resulted in the Proposed Settlement Agreement.

---

[2] Neither the Parties' Joint Motion nor the Settlement Agreement set forth when during the period 2000 through 2013 these 107 minority applicants suffered their respective harm.  For purposes of this objection, Mr. Badillo will assume their harm was evenly distributed over that 14 year period so that the average prospective claimant has 7 years of harm, which is also reasonably consistent with the United States' stipulation limiting back pay to 2007 and afterwards.

10.     On September 18, 2017, the parties filed the Joint Settlement Motion and the Proposed

Settlement Agreement.  The Settlement Agreement states that Defendants will hire up to 37

Prospective Claimants.  Thus, for at least two thirds of the Prospective Claimants, their only

relief is the Monetary Relief.  The Settlement Agreement provides for Monetary Relief to the

Prospective Claimants in the total amount of $450,000.  Notably, the Joint Motion provides no

explanation of how this amount was determined other than: "The relief afforded is less than what

could have been recovered had the United States prevailed at trial."  (emphasis added) (Joint

Memorandum, p. 22).

11.     Similarly, the Settlement Agreement itself does not set forth the basis of this amount

except to the extent it defines "monetary relief" as "a monetary award based on the United

States' calculation of some of the lost wages that the United States alleges would have accrued to

those persons who would have been hired into the position of correctional officer but for the

disparate impact of the written or revised written exam of the video exam."  (emphasis added).

However, there is no calculation or estimate set forth of the total amount of "lost wages"

incurred by those who suffered the disparate impact or any explanation of why the Monetary

Relief is less than the Prospective Claimants' total lost wages.[3]  Similarly, the Settlement

Agreement does not set forth how the Monetary Relief will be allocated among the Prospective

Claimants.  Notably, the "Interest-In-Relief" form attached to Appendix B does not request any

individual income information from Prospective Claimants, which suggests that the individual

awards will be arbitrarily determined.

12.     The Court scheduled a fairness hearing before the District Judge on February 7, 2018.

---

[3] By email dated December 16, 2017, Mr. Badillo's counsel asked the parties' counsel how the
Monetary Relief was calculated and how it would be distributed among the claimants.  On
December 18th, the United States' counsel declined to "disclose confidential settlement
communications with regard to how monetary relief was determined."  (Exhibit 2).

13.     Jayson Badillo is Hispanic.  (Affidavit of Jayson Badillo, ¶ 2, Exhibit 3).  He is 32 years old and has an associates decree in criminal justice from Gibbs College.  (Id. ¶ 3).  As a result, he has approximately $32,000 in student loan debt.

14.     From 2007 to 2011, Mr. Badillo worked as a correctional officer for the State of South Carolina.  (Id. ¶ 4).  His highest base salary was $31,072.00 plus fringe benefits.  (Id.).

15.     In 2011, Mr. Badillo moved back to Rhode Island because his ex-wife returned here with their children.  (Id. ¶ 5).

16.     Mr. Badillo took the RIDOC examination to be a correctional officer in 2011 and 2012.  (Id. ¶ 6). He does not recall being informed whether he passed the examination. (Id. ¶ 7).

17.     Had Mr. Badillo been hired by RIDOC, he believes his years of public service would have counted toward forgiveness of his student loans.  (Id. ¶ 8).

18.     Since 2012, Mr. Badillo has worked a variety of jobs in the area.  His average income from 2012 through 2016 was $29,437.  His fringe benefits varied from job to job and he is not presently able to determine their economic value.  (Id. ¶ 9).

19.     Mr. Badillo received the notice of the proposed settlement agreement on December 6, 2017.  The notice was postmarked December 1, 2017 and it was delivered to his former residence on December 6th.  (Id. ¶ 10).  The Notice stated that objections to it must be filed by December 19, 2017. [4]

20.     This notice was the first time Mr. Badillo learned that he may have been a victim of discrimination when he took the RIDOC examinations.  (Id. ¶ 11).

21.     None of the parties has ever asked Mr. Badillo to provide any information about his financial circumstances in relation to this lawsuit.  (Id. ¶ 12).

---

[4] By email to the parties' counsel on December 15, 2017, Mr. Badillo's counsel requested an extension of the December 19th deadline but this request was not accepted.  (Exhibit 1).

22.     As of 2017, the annual starting salary for correctional officers is $50,365.[5] The "fringe

benefits" include health, dental and vision coverage, pension plan, paid vacation and personal

days, paid holidays, sick leave benefit, college incentive pay, step pay increases, and a clothing

maintenance allowance. (Id.)  Given the relatively short time between when he received notice of

the Settlement Agreement and the deadline to file objections, Mr. Badillo has not located any

information on the economic value of Defendants' fringe benefits, but based on federal statistics

for state employees nationwide, he submits that a reasonable estimate is that they would be

approximately 60 percent of the salary.[6] Thus, the total economic value of the salary and fringe

benefits would be approximately $80,584 per year.

23.     According to the Rhode Island Department of Labor and Training, median per capita

income in Rhode Island for 2012-2016 was $31,904.[7] Similarly, in the Northeast, fringe benefits

cost private employers about 50 percent of salary.[8] Assuming this data would apply to all the

alternative employment the Prospective Claimants have had instead of CO positions with

RIDOC, their annual employment compensation was $47,856 ($32,904 plus 50 percent), or

$32,728 less per year than the value of the approximate employment compensation they would

have made as COs.

24.     Based on this number, Mr. Badillo estimates the amount of "back pay" to "make whole"

all Prospective Claimants is approximately $24 million ($24,513,272.00). He calculates this

amount as follows: $32,728 per year times 7 years average loss per Prospective Claimant times

107 Prospective Claimants.

---

[5] http://www.doc.ri.gov/administration/training/salary.php
[6] https://www.bls.gov/news.release/pdf/ecec.pdf
[7] http://www.dlt.ri.gov/lmi/census/inc/towninc.htm
[8] https://www.bls.gov/regions/southwest/news-release/employercostsforemployeecompensation_regions.htm

25.     Accordingly, the Monetary Relief of $450,000 amounts to less than 2 percent of the Prospective Claimants' collective back pay loss, not including pre-judgment interest.

26.     Based on the cost of fringe benefits for private employers in Paragraph 23, Mr. Badillo estimates his lost "back pay" through 2016 as a result of the disparate impact to be $180,507.00, not including prejudgment interest.

27.     By comparison, if all 107 Prospective Claimants submit claims for the Monetary Relief, are awarded some amount of the Monetary Relief, and the total amount of the Monetary Relief is disbursed, the average award will be $4,205.61 ($450,000 divided by 107).[9]

28.     Accordingly, Mr. Badillo's per capita share of the Monetary Relief would amount to approximately 2.3 percent of his actual lost back pay through 2016.

29.     On February 7, 2018, the Magistrate Judge held the "Fairness Hearing" respecting the Proposed Settlement Agreement. Counsel for Mr. Badillo appeared and objected to the proposed settlement as well as to the Magistrate Judge holding the fairness hearing on the settlement reached in a settlement conference with him.  (Transcript attached as Exhibit 4).  At the end of the hearing the Magistrate Judge said he would issue a Report and Recommendation that the Settlement Agreement be approved.  (Id. p. 66).

30.     On February 8, 2018, the Magistrate Judge issued a Report and Recommendation recommending that the Court approve the Proposed Settlement Agreement for the reasons set forth at the conclusion of the fairness hearing.

---

[9] It is unclear to whom the Parties propose to distribute the Monetary Relief.  They sent out thousands of notices of the Proposed Settlement Agreement.  If they distribute the Monetary Relief among thousands of people, the average award will be a token amount.

## Argument

**I.     IT WAS NOT APPROPRIATE FOR THE MAGISTRATE JUDGE WHO PRESIDED OVER THE SETTLEMENT CONFERENCE TO PRESIDE OVER THE FAIRNESS HEARING**

It was not appropriate for the magistrate judge who held the settlement conference to hold the fairness hearing respecting the Proposed Settlement Agreement. Corvello v. New England Gas Co., Inc., 2008 WL 5245331 at **4-5 (D.R.I. Dec. 16, 2008) (Torres, J.); see also, Decker v. GE Healthcare, Inc., 770 F.3d 378, 390 (6th Cir. 2014) (noting that the district court judge recused himself from deciding whether plaintiff could get prejudgment interest which required a showing of the parties' respective good faith efforts to settle because he was heavily involved in mediating the case); Becker v. Tidewater, Inc., 405 F.3d 257 (5th Cir. 2005) (a judge who had mediated a settlement conference should not subsequently become a trier of fact); Kearney v. Milwaukee County, No. 05C-835, 2007 WL 3171395 at *3 (E.D.Wis. Oct. 26, 2007) (magistrate judge holding that "absent exceptional circumstances, it is, and shall remain, my practice to recuse myself from proceeding as a trial judge in any case in which I conducted a mediation…").[10]

In Corvello, Judge Torres was involved in settlement negotiations between the plaintiffs and defendant.  The negotiations included *ex parte* discussions between the Court and each party respecting the strengths and weaknesses of their respective positions and an assurance to the parties by the Court that anything they told the Court would be held in confidence and not disclosed without their consent.  The parties subsequently disagreed as to whether a settlement had been reached and plaintiffs moved to enforce their understanding of the settlement

---

[10] See also, Herr, David F., "Annotated Manual for Complex Litigation (Fourth), §13.13, p. 171 (Thomson Reuters 2017) ("[M]any judges rarely engage in substantive settlement negotiations in cases they are expected to try, particularly by bench trial.  Instead, they bring in another judge or other neutral person for settlement purposes.").

agreement.  Defendant objected and moved to recuse Judge Torres from hearing the motion.

Judge Torres said:

> Knowledge obtained from statements made by a party during the course of settlement negotiations in which all parties are involved, generally, is not a basis for recusal because it is viewed as knowledge obtained through the judge's participation in the case.  [citation omitted]…However…when the knowledge is obtained through a confidential ex parte communication made to the judge during the course of settlement discussions, it seems difficult to characterize the information as being obtained during the course of a judicial proceeding. Exposure to such information also creates a risk that the information might influence the judge's determination with respect to some disputed fact in a way likely to be unfair to one of the parties.

2008 WL 5245331 at *4.  Judge Torres decided to recuse himself from hearing the motion to

enforce the alleged settlement agreement.

Here, while neither Mr. Badillo nor his counsel participated in the settlement conference,

his counsel has participated in a number of such conferences, including conferences with the

Magistrate Judge.  Typically, such conferences involve extensive *ex parte* communications with

the Magistrate Judge, including information that may not be part of the Court's record.  The

Magistrate Judge usually informs the parties that what they tell him in confidence will not be

disclosed to the other side without permission.  Mr. Badillo reasonably believes the Magistrate

Judge used the same procedures during both the unsuccessful and the successful settlement

conferences.

However, Mr. Badillo did not and could not participate in the settlement negotiations and

is apparently precluded from knowing anything that occurred.  Further, Mr. Badillo's counsel

had asked the parties for an explanation of how the Monetary Relief of $450,000 was

determined.  Counsel for the United States declined to disclose "confidential settlement

communications with regard to how monetary relief was determined". (Exhibit 2).  During the

Fairness Hearing, the Magistrate Judge approved of counsel's decision not to disclose settlement

conference communications.  (Exhibit 4, p. 34).  Nonetheless, the Magistrate Judge relied on his recollection of the confidential settlement conference that: "Like any litigated matter, a demand is made by one party and an offer is made by another and there's a back and forth negotiation that results in compromised number."  Id.  However, that does not answer the questions of where the parties started their negotiations or why they finished where they did, which is critical to knowing the range of settlement possibilities and the reasonableness of the "compromised number."

Mr. Badillo's counsel does not imply there is anything inappropriate about how the Magistrate Judge conducts settlement conferences.  To the contrary, counsel welcomes the Magistrate Judge's skillful participation in such conferences and finds they have been very effective either in resolving cases or in focusing the parties on the critical issues in the case. However, Mr. Badillo submits that the Magistrate Judge, having immersed himself in the parties' respective, confidential positions, including the strengths and weaknesses of their arguments, should not thereafter pass on the fairness of the settlement over the objection of a prospective claimant who could not participate in the settlement conference and who is not privy to the settlement negotiations.

Mr. Badillo acknowledges that the Magistrate Counsel issued a report and recommendation, not a decision, and the Court will presumably conduct a *de novo* review of the recommendation.  Blackman v. Eaton Corp., 587 Fed.Appx. 925, 934-35 (6th Cir. 2014) (holding that where magistrate judge presided over settlement negotiations, de novo review of his report and recommendation on summary judgment did not require recusal of the magistrate judge from the summary judgment motion).  However, the Court may rely on the factual findings of the report and recommendation and the Fairness Hearing, unless it conducts *de novo* an entirely new

fairness hearing with an appropriate notice (which includes the full value of the all the settled claims).

**II.     THE PARTIES HAVE THE BURDEN OF ESTABLISHING THAT THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE BUT THEY HAVE FAILED TO PROVIDE THE COURT WITH THE INFORMATION TO MAKE THAT DETERMINATION**

The burden of demonstrating the reasonableness of the settlement is on the parties advocating the consent agreement, especially where the defendant is essentially deemed liable and the settlement amounts to only a small fraction of the ultimate possible recovery.  In re Pet Food Products Liability Litigation, 629 F.3d 333, 354-56 (3rd Cir. 2010) ("Pet Food Litigation"); Cotter v. Lyft, Inc., 176 F.Supp.3d 930, 940 (N.D.Cal. 2016) (denying approval of class action settlement where class members would receive only 8.8% of their reimbursement claim); Axinn & Sons Lumber Co. v. Long Island R. Co., 90 F.R.D. 2 (E.D.N.Y. 1979) (denying approval of proposed settlement where the proposed settlement constituted less than 3 percent of the maximum exposure).

Title VII requires that a person be "made whole" for discrimination suffered at the hands of the defendant.  Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975).  Under Title VII, the court can order an unlawful employer to provide back pay to the victims of discrimination.  42 U.S.C. § 20002-5(g).  Back pay is an equitable remedy determined by the court.  David v. Caterpillar, 324 F.3d 851, 865 (7th Cir. 2003).  "An award of back pay compensates plaintiffs for lost wages and benefits between the time of the discharge and the trial court judgment."  Johnson v. Spencer Press of Maine, Inc., 364 F.3d 368, 379 (1st Cir. 2004).  In this case, the back pay

would normally run from the time of the Prospective Claimants would otherwise have been

hired.[11]

In an analogous case, not cited by the parties, Judge Pettine set forth the appropriate

financial remedies:

> The United States Supreme Court has made clear that, once a party has been
> found liable under Title VII, "back pay should be denied only for reasons which,
> if applied generally, would not frustrate the central statutory purposes of
> eradicating discrimination throughout the economy and making persons whole for
> injuries suffered through past discrimination. [citing Albemarle Paper Co.,
> supra]. Accordingly, although back pay is a discretionary remedy under Title VII,
> there is a "strong presumption" in favor of its award. [citation omitted].

United States v. R.I. Department of Employment Security, 619 F.Supp. 509, 511-12 (D.R.I.

1985). Judge Pettine rejected the State's argument that its fiscal circumstances should constrain

the damages remedy:

> Were state and local governments (to whom defendants are fairly analogized)
> who are found to have violated Title VII permitted to wrap themselves in the
> mantle of the public treasury, rather than to pay monies owing to the victims of
> their illegal conduct, Congress' purpose in subjecting such parties to the strictures
> of Title VII [citations omitted] would be wholly thwarted. [citation omitted].

Id. at 512. Judge Pettine also found that the financial award should include the value of fringe

benefits. Id. at 512; see United States v. Burke, 504 U.S. 229, 239 (1992); see also, Rivera v

Baccarat, Inc., 34 F.Supp.2d 870, 875 (S.D.N.Y. 1999).

Further, Judge Pettine held the financial award should include prejudgment interest: "I

find that an interest award is necessary in this case to effectuate fully the made whole remedy

invisioned by Congress in Title VII." Id. at 515. Indeed, the Second Circuit has said "it is

---

[11] The United States apparently stipulated during a hearing on Defendants' motion to dismiss that
"it would only be seeking back pay for conduct 'starting two years before the notice of
investigation letter [in September 2009] when the United States provided Rhode Island with
notice that it could face Title VII liability for the way it hires correction officers." U.S. v. Rhode
Island Dept. of Corrections, 81 F.Supp.3d 182, 195 n. 4 (D.R.I. 2015).

ordinarily an abuse of discretion not to include prejudgment interest in lost wages." Sharkey v.

Lasmo (AUL Ltd), 214 F.3d 371, 375 (2nd Cir. 2000).  It is within the court's discretion to

determine an appropriate amount of interest.  Robinson v. Instructional Systems, Inc., 80

F.Supp.2d 203, 208 (S.D.N.Y. 2000).  Some courts have calculated interested on the average

annual United States Treasury bill rated compounded annually.  See, 28 U.S.C. § 1961; E.E.O.C.

v. Everdry Marketing and Management, Inc., 556 F.Supp.2d 213, 223 (W.D.N.Y. 2008).[12]

"Made whole" relief often includes injunctive relief placing the injured plaintiff in the

position he or she would otherwise have obtained but for the unlawful discrimination.  See, In re

Employment Discrimination Litigation Against State of Alabama, 198 F.3d 1305, 1315 (11th Cir.

1999); Anderson v. Brennan, 254 F.Supp.3d 253, 260-61 (D.Mass. 2017).  If this relief is not

available, courts will often award "front pay" to compensate the plaintiff for future lost income.

Chin v Port Authority of New York & New Jersey, 685 F.3d 135, 151-52 (2nd Cir. 2012); U.S. v

City of New York, 258 F.R.D. 47, 57 (E.D.N.Y. 2009).  Here, it appears that only one third of

the Prospective Claimants, at most, will get the opportunity to become COs and, based on the

amount of the Monetary Relief, none of the others will get front pay.

The settlement of a Title VII enforcement action is subject to the same standard of

fairness, adequacy, and reasonableness that applies to settlements of class actions.  E.E.O.C. v

McDonnell Douglas Corp., 899 F.Supp. 1329, 1333 (E.D.Mo. 1995).  In assessing the fairness of

such a consent agreement, the court should consider the following factors:  (1) the existence of

fraud or collusion behind the settlement; (2) the complexity, expense and likely duration of the

litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the

---

[12] Mr. Badillo suggests that when an interest rate of 3.5 percent compounded annually is applied
to $24,513,272.00 for seven years the result is total back pay damages of $31,187,727.63 for
Prospective Claimants, collectively.  The Monetary Relief is less than 1.5 percent of this amount.

probability of plaintiff's success on the merits; (5) the range of possible recovery; and (6) the opinions of counsel.  (emphasis added).  Id.  In particular, the estimates of the values of the plaintiff's claims and of the settlement must be founded on "a sound methodological basis."  In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768, 818-19 (3rd Cir. 1995) ("We conclude that the district court erred by accepting plaintiff's witness's estimated valuations when those so clearly lacked a sound methodological basis and there were so many other indications…that the settlement was inadequate and unreasonable.").

The Third Circuit has said that in reviewing the reasonableness of a class action settlement seeking monetary relief:

> [D]istrict courts should compare "the present value of the damages plaintiff would likely recover if successful, appropriately discounted for the risk of not prevailing…with the amount of the proposed settlement."  [citations omitted].  "This figure should generate a range of reasonableness (based on size of the proposed award and the uncertainty inherent in these estimates) within which a district court approving (or rejecting) a settlement will not be set aside.

Pet Food Litigation, 629 F.3d at 354-55.  The Third Circuit then observed:

> Here, the settling parties failed to provide the District Court with estimations of recoverable damages for the Purchase Claims including sales information quantifying the amount of recalled pet food sold to consumers and the amount of refunds already paid to consumers.  If available, this information would have enabled the Court to make the required value comparisons and generated a range of reasonableness to determine the adequacy of the settlement amount.

Id. At 355.  The Circuit Court reversed and remanded because "the District Court lacked the information necessary to determine whether the $250,000 allocated to Purchase Claims was fair, reasonable, and adequate."  Id. at 356; see also, Adams v. Benton County Sheriff Kelly Craddock, No. 5:13-cv-05074, 2014 WL 12639862 at *3 (W.D.Ark. Aug. 1, 2014) (denying approval of settlement where "[t]he parties have provided only vague generalities about the strengths and weaknesses of the asserted claims and defenses.  Without more, the Court is unable to determine the fairness of the proposed settlement.").

Here, the parties have provided the Court with <u>no</u> information as to the full value of the claims nor of the likelihood of success on the merits or any other information that would "generate a range of reasonableness" so the Court can determine the adequacy of the settlement. Moreover, there is <u>no</u> explanation as to why the 2015 settlement conference was unsuccessful but the 2017 settlement conference was successful.[13]

Similarly, the Fifth Circuit has said: "In determining the fairness, adequacy and reasonableness of the proposed compromise…[t]he settlement terms should be compared with the likely rewards the class would have received following a successful trial of the case." <u>Cotton v. Hinton</u>, 559 F.2d 1326, 1330 (5th Cir. 1977), citing <u>Protective Committee v. Anderson</u>, 390 U.S. 414, 434 (1968).[14]  In that case, the circuit court approved a class settlement where "a fund of <u>unlimited amount</u> has been created to insure that any class member who has been discriminated against will be made whole."  (emphasis added).  <u>Id.</u> at 1334.  Accordingly, the district court did not have to consider whether the amount of the settlement was fair and reasonable.

Here, the Joint Motion sets forth detailed facts demonstrating that Defendants' testing procedures had a disparate impact on Prospective Claimants in violation of their rights under Title VII.  The Joint Motion does not identify any factually-supported, viable defense to this

---

[13] Mr. Badillo notes there was a change of administration in Washington, D.C., and it may be that the new administration is less interested in pursuing cases like this.  See, e.g., "Trump administration plans to minimize civil rights efforts in agencies," <u>Washington Post</u>, May 29, 2017.  <u>https://www.washingtonpost.com/politics/trump-administration-plans-to-minimize-civil-rights-efforts-in-agencies/2017/05/29/922fc1b2-39a7-11e7-a058-ddbb23c75d82_story.html?utm_term=.f98218d2f5f1</u>.

[14] Likewise, other circuit courts have held that one factor the district court should consider is "the range of reasonableness of the settlement fund in light of the best possible recovery."  <u>City of Detroit v. Grinnell Corp.</u>, 495 F.2d 448, 463 (2nd Cir. 1974); <u>In re Wireless Tel. Fed. Cost Recovery Fees Litigation</u>, 396 F.3d 922, 933 (8th Cir. 2005) ("The most important consideration in deciding whether a settlement is fair, reasonable, and adequate is the strength of the case for plaintiffs on the merits balanced against the amount offered in settlement.").

15

evidence.  Indeed, the Court denied Defendants' Rule 12(b)(6) motion and the Defendants

acknowledged at the Fairness Hearing that they were not contesting Plaintiff's evidence of a

disparate impact.  (Exhibit 4, p. 22).[15]  Hence, the Court should consider Defendants essentially

liable for purposes of the Settlement Agreement and place the burden on the parties to

substantiate that the Monetary Relief is an appropriate amount in the circumstances.

However, the Joint Motion and the Settlement Agreement provide no justification for the

amount of Monetary Relief.  Notably, the United States says it has calculated the back pay claim

but it does not provide that calculation.[16]  While the United States has stipulated that it seeks back

pay only since 2007, neither the Joint Motion nor the Settlement Agreement explain how this

stipulation may affect the Monetary Relief, or who may be entitled to participate, or how much

different groups of prospective claimants may get.[17]  Moreover, the Parties indicated at the

Fairness Hearing that the money will be awarded *pro rata* based on how long ago the

Prospective Claimants applied for CO positions, meaning that older "classes" would get more

money.  (Exhibit 4, p. 53).  Notably, this allocation completely discounts the significance of the

laches defense.  Further, the parties cite to no decision approving such a paltry percentage for a

settlement.  Essentially, the parties ask the Prospective Claimants and the Court to presume,

without more, that the Monetary Relief is adequate.  Accordingly, as a matter of law, the parties

have failed to justify the Settlement Agreement and their Joint Motion must be denied.

---

[15] At the Fairness Hearing, Defendants asserted they had other defenses but did not provide specific facts upon which the Court could assess the strength of those defenses.

[16] Moreover, the parties' counsel declined to "disclose confidential settlement communications with regard to how monetary relief was determined."  (Exhibit 2).

[17] For example, if the United States is not seeking back pay before 2007, does that mean that Prospective Claimants who suffered the discrimination before then are not eligible for the Monetary Relief?  On the other hand, if they are eligible, are they receiving relief for back pay that the U.S. has said it is not seeking and which should go to other Prospective Claimants?

In addition, the Joint Motion and the Settlement are largely devoid of specific facts bearing on the other factors the Court should consider when evaluating the fairness of the settlement.  For example, there is no discussion of how the complexity or difficulty or likely duration of the litigation affects the reasonableness of the Monetary Relief.  There is no explanation of how the discovery or the stage of the proceedings affects the merits of the Settlement Agreement.  There is no indication of how many depositions were taken or who was deposed.  Mr. Badillo notes that, although the litigation was brought in part to vindicate his rights, neither party gave him direct notice of it until he received the proposed Settlement Agreement in December 2017, nearly four years after suit was filed.  Suffice to say, he has not been deposed or otherwise provided any evidence.  There is no indication that any other Prospective Claimant was contacted, either.  No counsel has submitted a sworn affidavit setting forth his or her opinion as to the reasonableness of the Settlement Agreement, generally, or the Monetary Relief, in particular.

The Parties and the Magistrate Judge both emphasize the small number of genuine objections to the Proposed Settlement.  However, it is a reasonable assumption that if the notice to the Prospective Claimants had indicated that their collective back pay losses were as much as $24 million there would have been many more objections to the Monetary Relief of $450,000.  See, Walker v Hughes Communication, Inc., NO. 09-2136, 2011 WL 2650711 at **15-17 (N.D.Cal. July 6, 2011) (denying approval of settlement where the notice failed to state the size of the awards to class members).

In sum, the record before the Court does not substantiate the reasonableness of the Settlement Agreement.

III.   **BASED ON THE INFORMATION PROVIDED BY MR. BADILLO, THE PROPOSED AMOUNT OF MONETARY RELIEF IS UNFAIR, UNREASONABLE AND INADEQUATE**

The only data before the Court demonstrates that the proposed amount of Monetary Relief is unfair, unreasonable and inadequate.  See, Cotter v. Lyft, supra; True v. American Honda Motor Co., 749 F.Supp.2d 1052, 1075 (C.D.Cal. 2010) (rejecting class settlement involving coupons to class members.  "The Court is extremely skeptical of this outcome, particularly in light of the experience in other cases where less than 2% of the class redeemed similar rebates."); Reynolds v. King, 790 F.Supp. 1101, 1106 (M.D.Ala. 1990) (rejecting class action settlement where most of the class would receive "only token awards" of "approximately $371 each"); Axin & Sons Lumber Co. v. Long Island R. Co., supra (denying approval of proposed settlement where it constituted less than 3 percent of the maximum exposure).

Here, the Proposed Settlement is grossly inadequate considering that the only relevant data in this record is that provided by Mr. Badillo.  With respect to the class of Prospective Claimants, that data, derived from the Parties' own websites, indicates that the Prospective Claimants have a collective back pay loss of approximately $24 million.  Accordingly, the Monetary Relief of $450,000 is about 2 percent of the Prospective Claimants' collective back pay loss.  Put another way, the "made whole" damages of all the Prospective Claimants for "back pay" is approximately 50 times greater than the Monetary Relief.  This is woefully inadequate.

With respect to Mr. Badillo, he is well-qualified for the position of correctional officer. He is 32 years old, has an associate's degree in criminal justice, and worked for four years as a correctional officer for the State of South Carolina.  His lost back pay claim through 2016 is about $180,507.  However, if all 107 Prospective Claimants (and only those claimants) receive awards from the Monetary Relief, the awards will average $4,206.61 ($450,000 divided by 107).

Accordingly, Mr. Badillo's per capita award for lost back pay through 2016 would be approximately 2.3 percent of his actual loss.[18]  This is terribly inadequate.

Indeed, the Magistrate Judge acknowledged during the Fairness Hearing that the Monetary Relief was a very small amount.  (Exhibit 4, pp. 38-39).  He thought, however, that the injunctive relief balanced it out.  But, since the Defendants admit that their testing procedures had a disparate impact, abandoning them seems like a foregone conclusion.

Moreover, the amount of the Monetary Relief is the critical part of the proposed Settlement Agreement. While the Settlement Agreement provides that some Prospective Claimants will be hired, that relief is limited to one third of them, at most.  (Settlement Agreement, ¶¶ 90, 93).  Hence, for at least two thirds of the Prospective Claimants, the Monetary Relief is the only form of relief that they will receive.

In addition, a victim of discrimination would normally be entitled to lost "front pay" if he or she does not receive the employment they would have otherwise obtained.  Here, at least two thirds of the Prospective Claimants will not receive one of the "up to" 37 CO positions set forth in the Proposed Settlement.  It is clear that the Monetary Relief includes no "front pay" for those two thirds (or more) who will not get a job.  Thus, based on the only relevant data before the Court, the Proposed Settlement Agreement is woefully inadequate.

At the Fairness Hearing and in the Report and Recommendation, the Magistrate Judge said that because the Parties are government agencies, their settlement was entitled to "some deference."  (Exhibit 4, p. 65).  However, deference does not substitute for data.  If it could, the Fairness Hearing would be unnecessary.  Moreover, the only available data clearly demonstrates that the Proposed Settlement is grossly inadequate.

---

[18] Mr. Badillo has additional lost back pay through 2017 that will push his total lost back pay to over $200,000.  That is almost half of the Monetary Relief for all 107 Prospective Claimants.

The parties state in their recent Motion for Entry of Final Order that "the door has closed on Mr. Badillo's EEOC claim."  If so, that is because the parties closed the door on him.  They knew he had been the unknowing victim of discrimination and they failed to inform him until after his only opportunity for compensation became this case.  Instead, pursuant to federal statute, Plaintiff expressly undertook to represent Mr. Badillo's interests and those of the other Prospective Claimants by asserting their claims for "made whole" damages, including back pay and front pay.  Thus, Plaintiff assumed a fiduciary relationship toward the Prospective Claimants and has a duty to recover at least an adequate amount of their "made whole" damages.  See, Fletcher v. United States, 730 F.3d 1206, 1212-13 (10th Cir. 2013) (Gorsuch, J.) (United States assumed fiduciary obligations to Osage Nation tribal members to manage mineral rights and provide them an accounting); Hopi Tribe v. United States, 55 Fed.Cl. 81, 94 (Clm.Ct. 2002) (when United States assumes an obligation to represent an Indian tribe in litigation and it does so pursuant to statute, it acts as a fiduciary for that tribe).  Moreover, Plaintiff apparently used the Prospective Claimants' "made whole" damages as a bargaining chip in the settlement negotiations.  As a fiduciary, it cannot sell those claims short for its own interest in settlement.

If it is true that Mr. Badillo cannot recover in an individual action that makes it all the more imperative that this settlement be fair.  However, it is not fair.  The Monetary Relief is pathetically small in relationship to the actual back pay losses of the Prospective Claimants.  Moreover, if hundreds or even thousands of people make claims for the Monetary Relief and they get all the amount of the Monetary Relief, they will get average awards that may be token, at best.  Mr. Badillo, who was highly qualified for one of the CO positions and who has lost hundreds of thousands of dollars of back pay to date will get only a tiny fraction of his actual damages.

**IV.    THE SETTLEMENT PROCEDURES ARE UNFAIR WHERE THEY SET FORTH NO OBJECTIVE STANDARDS BY WHICH THE RELIEF WILL BE AWARDED AMONG THE PROSPECTIVE CLAIMANTS AND THEY REQUIRE THE PROSPECTIVE CLAIMAINTS TO EXECUTE RELEASES BEFORE THEY KNOW WHETHER THEY WILL GET A JOB**

The claims resolution process must be procedurally fair.  See, In re Sony PS3 "Other OS" Litigation, No. 10-cv-01811, 2017 WL 424716 at *4 (N.D.Cal. Jan. 31, 2017 (denying final approval of class action settlement where the claims process was not shown to be fair).  Here, the proposed procedures for allocating both the equitable and the monetary relief are vague and obscure, at best.  Ross v. Lockheed Martin Corp., 267 F.Supp.3d 174 (D.D.C. 2017); see also, Herr, David F., "Annotated Manual for Complex Litigation (Fourth)," §13.14, pp. 173-74 (Thomson West 2017) ("The judge must have information sufficient to consider the proposed settlement fully and fairly.  All terms must be disclosed, so that the judge can understand the agreement's effect on those not parties to the settlement and help prevent collusion and favoritism.").

Here the settlement procedures are unfair for several reasons.  First, there are no reasonable, objective standards as to how the $450,000 in Monetary Relief will be allocated among the Prospective Claimants other than it will be "fair and equitable."  Second, there are no objective standards as to how the 37 jobs will be filled from among the Prospective Claimants.  Third, the Prospective Claimants are required to sign releases of their claims before they know whether they will get one of those 37 possible jobs as a correctional officer.

In Ross, the court rejected a proposed settlement agreement of a Title VII disparate impact class action discrimination claim because of the inadequate procedure for resolution of individual class member's claims where the class members were required to opt out or to release their claims before they knew how much money they would get from the settlement. Moreover,

the settlement agreement required the class members to release all claims they would have

against the defendant, not just the ones that were the subject of the litigation.  In addition, class

members who did not respond to the notice would be deemed to have relinquished their claims.

The court said:

> [F]or all its detail, the class notice provides no sense of what the minimum
> recovery is likely to be; no sense of what the average recovery is likely to be; and
> no sense of how giving particular answers on the form will likely influence the
> amount of a class member's recovery… As things currently stand, this Court has
> no idea how Plaintiffs' counsel could possibly have determined that the amount
> that Lockheed is offering to settle this case is sufficient to redress the legal claims
> of the class members…And of course, if Plaintiff's counsel <u>does</u> have some
> knowledge of, and projections about, the scope of the absentee class members'
> discrimination claims, then the value of the claims can be estimated, at least in
> general terms, and this recovery-related information should be provided to the
> class as part of the notice.   What is more, it is clear to this Court that no
> reasonable counsel advising an individual absent class member would encourage
> his client to agree *ex ante* to release legal claims that the lawyer has not yet
> evaluated in the hope that a claims official might subsequently do the work of
> assessing the strength of his client's case and paying a worthy settlement amount.
> And yet, that appears to be precisely what Plaintiffs' counsel proposes…

<u>Id.</u> at *19.

Here, there are no guidelines or standards set forth as to how the 37 Prospective

Claimants may be hired.  There are no guidelines or standards set forth as how the amounts of

Monetary Relief shall be allocated among the Claimants except that it will be "reasonable and

equitable."  (Proposed Settlement Agreement, p. 20, ¶ 51).  Notably, the claims forms do not ask

for much personal information including age, qualifications, other employment history, or

income so it is entirely unclear how the Monetary Relief could be allocated "reasonably and

equitably."

To the contrary, it appears that the distribution will be unreasonable and arbitrary.  At the

Fairness Hearing, the parties indicated the distribution will be *pro rata* according to how long

ago a claimant may have applied, i.e., their "class."  This distribution ignores the Defendants'

laches defense, which is the defense defendants have factually supported.  (If the Parties submit that the laches defense should be ignored that makes the Proposed Settlement even more unreasonable).  This method of distribution also ignores that there may be great variations in the qualifications of the claimants within any particular class.  Awarding the same amount of monetary relief to an applicant who would not have been hired even with a non-discriminatory testing procedure as to an applicant with very good qualifications is not fair and reasonable.

The Settlement Agreement does provide that Prospective Claimants will receive notice of the proposed individual awards and an opportunity to object at a second Fairness Hearing.  However, the Settlement Agreement does not provide that the notice will explain how the individual awards were determined.  Accordingly, this will make it very difficult for the Prospective Claimants to dispute the amounts of their individual awards.  See, Parra v. Quality Controlled Concrete, LLC, No. 1:13CV1113, 2015 WL 12750445 at *3 (M.D.N.C. Mar. 11, 2015) (denying motion to approve settlement where notice of settlement did not advise Potential Participants of the manner in which individual awards would be determined).

Importantly, the determination of which Prospective Claimants will be hired will be made after the Prospective Claims are required to sign release forms.  Obviously, whether a Prospective Claimant is going to be hired makes a big difference as to whether he or she may be satisfied with the Monetary Relief he or she is receiving.  Moreover, if it is true that the "door has closed" on the Prospective Claimants' individual claims, as the parties argue, then releases are unnecessary.  Thus, for all these reasons, the Proposed Settlement is procedurally unfair, in addition to being substantively unfair.

**Conclusion**

The Court should order the parties to make the amount of the "Monetary Relief"

unlimited with an appropriate, objective procedure for the Prospective Claimants to claim the full

amount of their respective lost back pay, including prejudgment interest, or the Court should

order the parties to provide a satisfactory explanation of how the amount of "Monetary Relief"

should be limited to a specific amount, with a fair and objective process for allocating the

Monetary Relief and the 37 correctional officer positions among all Prospective Claimants.

Prospective Claimant Jayson Badillo, by his
attorneys

*/s/ Thomas W. Lyons*
Thomas W. Lyons, #2946
Rhiannon S. Huffman, #8642
Strauss, Factor, Laing & Lyons
One Davol Square, Suite 305
Providence, RI  02903
401-456-0700
tlyons@straussfactor.com

**CERTIFICATE OF SERVICE**

I hereby certify that on February 19, 2018, I filed and served this Objection electronically
via Pacer in the Court's docket.

*/s/ Thomas W. Lyons*